In re Ray Eugene JOINER, a/k/a Joiner Hog Farm, Debtor.

Paul L. Cames, Plaintiff,

v.

Ray Eugene Joiner, as Executor of the Estate of Katie Louise Joiner, Defendant.

Bankruptcy No. 01–11991–JDW.

Adversary No. 02–1047–JDW.

United States Bankruptcy Court, M.D. Georgia, Albany Division.

Nov. 5, 2004.

Pruett W. Burge, Paul L. Cames, Warner Robins, GA, for Trustee–Plaintiff.

F. Anthony Blakey, Albany, GA, for Debtor–Defendant.

Patrick S. Flynn, Albany, GA, for Bank of Edison.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

This matter comes before the Court on Bank of Edison's objection to Trustee's motion to compromise an adversary proceeding for turnover. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(E). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

On May 24, 2000, Katie Louise Joiner executed a last will and testament. She did so, according to her son, Ray Joiner, Debtor in this case, because after plowing $200,000 into Debtor's failing hog farm, she did not want to put any more of her money into the venture. Debtor consulted two attorneys on his mother's behalf, and

both recommended that she place her estate in a spendthrift trust. Her will was drafted to do just that.

At the time she executed the will, Mrs. Joiner was receiving morphine intravenously. She signed the will by using a rubber stamp of her signature. She had been using the stamp to sign checks for about a year because arthritis and other health problems prevented her from holding a pen. Debtor assisted his mother in stamping the signature line by placing his hand over hers as she used the stamp. Gordon Bonner and Misty Jackson witnessed the execution of the will. The witnesses signed an affidavit on May 24, 2000, stating that Mrs. Joiner was of sound mind at the time she executed the will. The affidavit was notarized by Martha Bonner. In the case of the will, the day and the month were handwritten and the year was printed on the signature page. In the case of the affidavit, the day was handwritten and the month and year were printed above the notary's signature.

According to Debtor, Mrs. Joiner did not read the will before signing it, but Debtor explained its contents to her. Debtor also did not personally read the will prior to execution, but had it explained to him by the attorney who drafted it. After the will was executed, Mrs. Joiner's previous will was destroyed. The provisions of the previous will are unknown.

Item four of the will directed all Mrs. Joiner's property to be placed in the Ray Eugene Joiner Family Trust (the "Trust"). That property, which has a total value of more than $400,000, included 260 acres of land, a certificate of deposit, and a house. Article 4.1 of the Trust provided that its income or corpus be used "for the care, support and maintenance of Ray Eugene Joiner for his natural life, if needed." Article 7.8 provided that "no interest of any beneficiary shall be subject to anticipation,

to claims for alimony or support, to claims for debts of a beneficiary, to voluntary transfer without the written consent of the trustee, or to involuntary transfer in any event." Debtor's children were named as the remaindersmen. The will made no provisions for the devise of any property in the event the Trust failed. Thus, the property likely would pass by intestate succession to Debtor, who is Mrs. Joiner's only child.

The Trust was dated May 23, 2000, one day before Mrs. Joiner executed the will. The date was printed on the first page of the Trust. Mrs. Joiner stamped her name on the last page of the document as the settlor of the Trust. The Trust was neither witnessed nor notarized. No date, either handwritten or printed, appears on the signature page. At his 2004 examination, Debtor testified that the Trust was executed one or more days after the will was executed because the attorney did not have the Trust instrument ready. However, Mr. Cames indicated that Debtor is prepared to change his statement and testify that the Trust was executed either prior to or concurrently with the will.

Mrs. Joiner died on or about June 6, 2000, approximately five weeks after being diagnosed with lung cancer. Sometime after her death, Mrs. Joiner's will was probated in Calhoun County. Debtor has not disposed of any of the property from Mrs. Joiner's estate and has agreed to an injunction prohibiting any such disposition.

Debtor filed a Chapter 7 petition on October 19, 2001. Debtor received a discharge on January 31, 2002, and the case was closed on May 23, 2002. The Bank of Edison filed a motion to reopen the case to allow the trustee to examine the possibility that the assets of Mrs. Joiner's estate, which had purportedly passed into the Trust, had actually passed to Debtor upon her death, thus becoming assets of the

bankruptcy estate. The Court granted the motion and appointed Paul L. Cames as trustee.

On December 12, 2002, Mr. Cames filed an adversary proceeding against Debtor for turnover of property that had belonged to Debtor's mother prior to her death. The adversarial proceeding was held in abeyance so the parties could pursue the matter in state court. On June 2, 2004, prior to the filing of a state court case, Mr. Cames filed a consent order, by which he agreed to accept a payment of $50,000 from Debtor to settle any claims he may have against Debtor as an individual or as executor of his mother's estate. The order was vacated due to lack of notice to creditors. Mr. Cames then filed and properly served a motion to compromise the adversary proceeding. He had not discussed the settlement with any creditors prior to filing his motion. Edison objected to the motion. At a hearing on the motion on September 27, 2004, First State Bank of Arlington also opposed the compromise.

The total amount of unsecured claims in the case is approximately $130,000. A $50,000 settlement would return a dividend of approximately 38 percent. Edison has an unsecured claim of approximately $67,000, and Arlington has an unsecured claim of approximately $13,000. Therefore, their claims make up approximately 61 percent of the total amount of unsecured claims.

At the time Mr. Cames was negotiating the compromise, he was only aware of approximately $89,000 in unsecured claims. The $50,000 settlement would have resulted in a dividend of approximately 56 percent. If he were successful in the state law case and subsequent turnover proceeding, the unsecured creditors would receive a 100 percent dividend, including postpetition interest. Furthermore, no money was available to prosecute the case. Although

Mr. Cames did contact one attorney about taking the case on a contingency fee basis, the attorney did not get back to him until after a settlement had been reached.

In evaluating his case, Mr. Cames met with Debtor. He found Debtor to be a likeable, well-spoken individual. After asking Debtor about his deposition testimony with regard to the date the Trust was signed, Mr. Cames concluded that a jury could believe that Mr. Joiner got confused and was flustered during the 2004 examination. Consequently, a jury also could believe Debtor if he were to recant his deposition testimony and state, instead, that the will and trust were signed contemporaneously. Mr. Cames also believed that Debtor's contradictions would increase the complexity of the litigation. They would preclude summary judgment, and the case likely would be appealed. Mr. Cames further concluded that the likelihood of appeal meant the case could not be resolved in less than six months.

Timothy Davis, an expert in general civil litigation presented by Edison, indicated that based on Debtor's deposition, the case with regard to the validity of the trust was not complex. He said that Debtor's recantation may add to the complexity, but it would create serious credibility problems for Debtor. In the circumstances, Mr. Davis said he would be willing to take such a case on a contingency fee basis and would expect to have better than a 50 percent chance of prevailing.

With these facts in mind, the Court now considers whether approval of the compromise is appropriate.

### Conclusions of Law

█ Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." At issue in this case is

whether the Court should approve the compromise of the adversary proceeding for turnover. The Court must inquire into the reasonableness of the proposed settlement, determining "whether [it] falls below the lowest point of the range of reasonableness." *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 758 (Bankr. S.D.N.Y.1992); *see also In re Pacific Gas & Elec. Co.,* 304 B.R. 395, 416–17 (Bankr. N.D.Cal.2004).

The Eleventh Circuit Court of Appeals has articulated four factors for the Court to consider in its analysis:

"(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1549 (11th Cir.1990) (quoting *Martin v. Kane (In re A & C Properties),* 784 F.2d 1377, 1381 (9th Cir.1986)); *see also Kelley v. Grot (In re Grot),* 291 B.R. 204, 207 (Bankr.M.D.Ga.2003).

### Probability of success in the litigation

The litigation in question is an attack on the validity of Mrs. Joiner's will and the validity of the Ray Eugene Joiner Family Trust. The Court is not required "to *decide* the merits of those claims-only the *probability* of succeeding on those claims." *Justice Oaks,* 898 F.2d at 1549.

Beginning with the will, Edison claims that it is a product of undue influence, that it was not executed freely and voluntarily, and that Mrs. Joiner did not have knowledge of its contents. According to Georgia law,

[a] will must be freely and voluntarily executed. A will is not valid if anything destroys the testator's freedom of volition, such as fraudulent practices upon the testator's fears, affections, or sympathies; misrepresentation; duress; or undue influence whereby the will of another is substituted for the wishes of the testator.

O.C.G.A. § 53–4–12 (1997).

With respect to the claim of undue influence, Edison cites *White v. Regions Bank,* 275 Ga. 38, 561 S.E.2d 806 (2002), for the proposition that a presumption of undue influence arose because Debtor substituted his own wishes for those of his mother. However, that case stated that, " 'evidence showing only that the deceased placed a general trust and confidence in the primary beneficiary is not sufficient to trigger the rebuttable presumption.' " *Id.* at 40, 561 S.E.2d at 808 (quoting *Crumbley v. McCart,* 271 Ga. 274, 275, 517 S.E.2d 786, 787 (1999)). Rather, the presumption arises when a substantial beneficiary, who is not a natural object of the testator's affection, has a confidential relationship with the testator. *Holland v. Holland,* 277 Ga. 792, 793, 596 S.E.2d 123, 125 (2004). "[A]n opportunity to influence and a substantial benefit" are not by themselves enough to prove undue influence. *Id.* While it is possible that a presumption of undue influence might arise, it is hardly probable. It is true that Debtor, not Mrs. Joiner, met with the drafting attorney. However, the changes in the will were initiated by Mrs. Joiner based on her desire to cease funding the hog farm. There is a strong argument to be made that Debtor was acting under Mrs. Joiner's direction rather than exerting influence over his mother. The argument for undue influence is further eroded by the fact that the change in the will did not divert Mrs. Joiner's estate away from the natural ob-

jects of her affection. Debtor, her only son, was the beneficiary of the Trust funded by the will.

Edison also has argued that the fact that Debtor's mother was on her deathbed and under the influence of painkillers at the time she executed the will factors into the validity of the will. In addition, the fact that Debtor helped her stamp her name on the will, and he, rather than his mother, met with the attorney who drafted the will shows it was not made voluntarily. However, the only evidence shown by either party as to Mrs. Joiner's state of mind are the affidavits of the witnesses to the will that indicate she was of sound mind. There is no evidence to show that the morphine adversely affected her testamentary capacity. *Cf., Kievman v. Kievman,* 260 Ga. 853, 853, 400 S.E.2d 317, 317–18 (1991) (testimony of subscribing witnesses as to testator's mental capacity was rebutted by affidavit of testator's daughter, creating a question of fact).

■ Edison's final argument against the validity of the will goes to Mrs. Joiner's knowledge of its contents. "Knowledge of the contents of a will by the testator is necessary to the validity of a will. If the testator can read, the testator's signature or acknowledgment of that signature is presumed to show such knowledge." O.C.G.A. § 53–4–21 (1997). Edison argues that neither Debtor nor Mrs. Joiner read the will prior to its execution. However, Debtor testified that the drafting attorney explained it to him and he in turn explained it to his mother. Furthermore, Mrs. Joiner's signature creates a presumption that she knew the will's contents.

The brief foray into Georgia law indicates that while it is *possible* the trustee could prevail on a challenge to the will, the probability of such success is relatively low. This is particularly true given the fact that the will already has been successfully probated.

Even assuming the trustee could not succeed in a challenge to the will, he has a significantly stronger case on the validity of the Trust.

> A devise or bequest . . . may be made by a will to the trustee or trustees of a trust established or to be established by the testator . . . if the trust is identified in the testator's will and its terms are set forth in a written instrument, other than a will, *executed before or concurrently with the execution of the testator's will* . . . .

O.C.G.A. § 53–12–71(a) (1997) (emphasis added). The Court is unaware of any Georgia cases interpreting this section. Mr. Cames essentially would be proceeding on a clean slate.

The only evidence on this point is the Trust instrument and the testimony of Debtor, which may be recanted. Although the first page of the Trust is dated May 23, 2002–one day before the will was executed—Debtor testified under oath at his 2004 examination that it was not executed until at least a day later, and the signature page is not dated. Debtor is apparently prepared to recant his deposition testimony, but as Mr. Davis pointed out, it would seriously impair Debtor's credibility. Even Mr. Cames acknowledged that witnesses often change their testimony upon realizing that the testimony hurts their case. Mr. Davis testified that with the evidence available in this case, he would expect to have more than a 50 percent chance of prevailing. The Court agrees that there is a greater probability of success than failure with respect to the validity of the Trust.

### Difficulties, if any, to be encountered in the matter of collection

Collecting on a judgment in the trustee's favor would not be a problem. Mr. Cames

indicated that Debtor voluntarily agreed to an injunction preventing the disposition of any of the disputed property. Therefore, the property would be readily available to the trustee should he succeed on the merits of his claim.

*Complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it*

Mr. Cames has argued that Debtor's inconsistent positions with respect to the date the Trust was executed makes this litigation complex. The Court disagrees. The only issue to be decided is the date of execution. The only evidence to be considered is Debtor's testimony and the Trust agreement. The trier of fact will be required to determine Debtor's credibility and not much else. That is hardly complex. In fact, it could not be more straightforward and routine.

Mr. Cames also argues that the likelihood of appeal will draw out the litigation process and that there are no funds available to prosecute the suit. But, as previously noted, this is a relatively simple case, and much of the work—at least in terms of discovery—has already been done by Edison. While it is true that the case may be appealed, the same can be said for any case. As to funds available to prosecute the case, an expert in civil litigation has testified that this is the type of case he would be willing to take on a contingency fee basis, so the absence of funds does not necessarily create an obstacle.

*Paramount interest of the creditors and a proper deference to their reasonable views in the premises*

In this case, two creditors who hold more than half of the unsecured claims have strongly objected to settlement. These creditors have the most to lose if litigation were resolved in favor of Debtor. Their willingness to see the case go forward in spite of the risk weighs heavily in the Court's decision, as does the magnitude of the fund at stake. A win would mean full payment to all unsecured creditors plus interest and attorney fees. In addition, the fund is large enough that even Debtor would walk away with a substantial sum.

## Conclusion

In summary, the trustee has a better than 50 percent probability of succeeding on a challenge to the Trust. Difficulties in collecting on a judgment are virtually nonexistent because the property of Mrs. Joiner's estate is subject to an injunction pending resolution of this matter. This is a relatively simple case that basically turns on the credibility of a single witness, and it is one that an attorney likely would be willing to take on a contingency fee basis. Although there is a possibility that the litigation may be drawn out by appeals, that possibility does not outweigh the other factors. Finally, unsecured creditors holding approximately 61 percent of the claims strongly oppose settlement. Because they have such a significant stake in the matter, the Court affords their position considerable weight.

At the time Mr. Cames negotiated the $50,000 compromise, he believed the unsecured claims totaled only $89,000, which would result in a dividend of approximately 56 percent. This would be a good settlement in the face of uncertainty about the outcome of the case and the possibility of protracted litigation. However, when there is a probable chance of success in a case that will result in a 100 percent payout, settling the case for what amounts to less than a 40 percent dividend over the objection of the parties with the most to lose is not reasonable. Therefore, the Court will sustain Edison's objection and deny the trustee's motion to compromise.

An Order in accordance with this Opinion will be entered on this date.

### ORDER

In accordance with the Memorandum Opinion entered on this date, the Court hereby SUSTAINS the Bank of Edison's objection to the Chapter 7 Trustee's motion to compromise and further hereby DENIES the Chapter 7 Trustee's motion to compromise.